UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| HENRY LEONARD | * | CIVIL ACTION |
| | * | |
| | * | NUMBER 07-0813 |
| VERSUS | * | |
| | * | JUDGE WALTER |
| | * | |
| STATE OF LOUISIANA, ET AL HORNSBY | * | MAGISTRATE |

**********************************************************************

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

SUSAN WALL GRIFFIN
Bar Roll No. 22402
Attorney for the Secretary
Department of Public Safety & Corrections
P.O. Box 94304, Capitol Station
Baton Rouge, La. 70804-9304
(225) 342-6743

**Attorney for Movants/Defendants,
STATE OF LOUISIANA, JAMES LE
BLANC, VENETIA MICHAEL AND
JACKIE HAMIL**

## TABLE OF CONTENTS

COVER SHEET...................................................................................i

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES ............................................................iii

I.     FACTUAL BACKGROUND ....................................................1

II.    STANDARD OF REVIEW ......................................................6

      A.     Summary Judgment Standard of Review ......................6

      B.     Standard of Review for Free Exercise of Religion Claims ..........7

III.    ARGUMENT .............................................................................8

      A.     All Inclusive Islamic Services .......................................8

      B.     Security Concerns Justify the Rejection
           of the *Final Call* Magazine  ……………………………..14

      C.     Punitive Damages .......................................................23

IV.    CONCLUSION .......................................................................24

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S.242, 247-248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986) ...........................7

*Chriceol v. Phillips*, 169 F. 3d 313, 316 (5th Cir. La., 3/24/1999) .................8, 13, 21

Murphy v. Missouri Department of Corrections, 372 F.3d 979, 982
(8th Cir. 6/22/2004) ...............................................................................8, 22, 23

*Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874,
104 L.Ed.2d  459(1989)...........................…..................…...............................8

*Days v. Johnson, 322 F.3d 863, 866 (5th Cir. 2003)* .....…........…......…..............9

*Turner v. Safely,* 107 S.Ct.2254, 482 U.S. 78, 96 L.Ed.2d 64 (1987) ............. 8, 13, 24

*Powell v. Estelle,* 959 F.2d 22 (5th Cir. 1992) ..............….....….......................... 14

*Michael Williams, et al v. Warden Burl Cain, et al,* (Civil Action No. 95-1920-A1)(M.D. LA. 7/28/1998)................................….................................…………….............. 14

*Edwin Codrington v. Richard L. Stalder,* (Civil Action No. 06-5-JJB-DLD) (M.D. LA. 5/5/2007)...............................…………….....................................…........ 14

*John   Fuller   v.   Richard   Stalder   (Civil   Action   No.   99-679-B-3   (M.D.   LA 2/23/2001)....................................…………….....................................….....................14*

*Brown v. Ridge,* 2006 WL 15811167 (W.D.La. 1/19/2006) .............….....................21, 22

*Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir. 1978) ................…….......….......... 22

*Pell v. Procunier,* 417 U.S. 817, 823 (1974) .......................................….........23

*Hicks v. Garner,* 69 F.3d 22, 25 (5th Cir. 1995) ....................................……… 23

*Whitley   v.   Albers,   475   U.S.   321,   321-22,   106   S.Ct.   1078,   89L.Ed.2d   251 (1986).........................................................................................…..  23*

*Thornburgh v. Abbott,* 490 U.S. 401, 416, 109 S.Ct. 1874, 104 L.Ed.2d 459........23, 24

*Shabazz v. Parsons,* 127 F.3d 1246, 1249 .....................................….............24

*Knox v. City of Monroe,* WL#936965 at p. 1(W.D. La. 4/6/2009) ........…………...........25

*Williams v. Kaufman City.,* 352 F.3d 994, 1015 (5th Cir. 2003) ......................………..25

## Rules

FRCP Rule 25(d) ……………………………………………………………………1

## Statutes

42 U.S.C. § 1997e(a) ...........…….......................................................................................9

iii.

**May It Please the Court:**

This memorandum is submitted in support of the Motion for Summary Judgment filed on behalf of the defendants, STATE OF LOUISIANA through DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS (hereinafter referred to as ("The Department"), SECRETARY JAMES M. LEBLANC[1], ("LeBlanc"), WARDEN VENETIA MICHAEL ("Michael"), and LT. COL. JACKIE HAMIL[2] ("Hamil").

## I.   FACTUAL BACKGROUND

The Plaintiff, Henry Leonard, hereinafter referred to as "Leonard", is incarcerated by the State of Louisiana through the Department and housed at David Wade Correctional Center ("DWCC"). He was convicted of committing second degree murder and was sentenced to serve life imprisonment. As Leonard had previous law enforcement employment, he is housed in N-5, the protective unit of DWCC. For his own security, he is housed separate and apart from the general population.[3]

Leonard states that he joined the Nation of Islam ("NOI"), in 1985 while he was living and working in Baton Rouge.[4] He submitted his membership data and was accepted by the Nation of Islam Headquarters as a member.[5] Leonard did not take a new name upon acceptance to the NOI,[6] despite the NOI spokesperson Ms. Ava Muhammad's testimony that it is traditional upon membership to the NOI to discard the member's original slave name and take a new name, often

---

[1] James LeBlanc succeeded Richard Stalder as the Secretary of the Department in January 2008, and was substituted as party defendant in accordance with FRCP Rule 25(d).
[2] Lt. Col. Hamil has been promoted to Colonel since the filing of the instant lawsuit. He has been succeeded as Mail Room Supervisor at DWCC by Col. Anthony Turner.
[3] DWCC is the only state penal institution equipped with a protective unit. The protective unit houses persons with prior law enforcement backgrounds, clergy, and/or persons with high profile crimes whose safety would be at risk if housed in general population. (Exhibit 1, Deposition of Warden Jerry Goodwin, at p. 63.)
[4] Exhibit 2, Excerpts of Henry Leonard Deposition, at p. 33.
[5] Ibid at p. 39. The Nation of Islam through its spokesperson, Ava Muhammad, states that it does not keep membership records. (Exhibit 3, Excerpts of Ava Muhammad deposition at p. 129.)
[6] Exhibit 2 at pp.163-165.

1

expressed as an "X". [7]  Leonard states that as a practicing member of NOI, that the Qur'an is the primary source for his religious beliefs, he is required to participate to the best of his ability in the Five Pillars of Faith of the Islamic faith, and he is to refrain from eating all pork products. [8]  The practice of these tenets of orthodox Islam by NOI members was confirmed by Ms. Muhammad.[9] Despite Leonard's selection of the religion of "Baptist" upon his classification at intake[10], the Department does not contest or question Leonard's NOI membership.

The Department has two major missions: (1) to protect the safety of the offenders, staff, visitors and the public at large and (2) to attempt to rehabilitate the offender and ease reentry into society at large upon his release from custody. [11]  These missions have been aided by the development of faith based programs.  In Department Regulation, No. B-08-005, these goals are made explicit:

> **5.**   **Policy:** It is the Secretary's policy that all offenders be given the opportunity to practice their faith on a voluntary basis, limited only when necessary to accommodate other legitimate institutional interests consistent with the safety, security and orderly operation of the institution. [12]

> **7.**   **Procedures:**

> B.  Faith-based programs have the potential to facilitate an offender's institutional adjustment and to help the offender assume personal responsibility by establishing a spiritual foundation from which to make sound moral decisions. These programs will be designed so as to assist offenders in becoming more productive members of society upon release and to further the Department's reentry initiatives. * * * Such procedures shall include the following topics:
> 2) Opportunities to practice one's faith individually and in a group along with information about access to those opportunities;
> 3) Possession of authorized symbols and/or items essential for faith practice purchased through authorized vendors;
> 4) Access to approved publications related to faith-based beliefs;

---

[7] Exhibit 3 at p. 47.
[8] Exhibit 2 at pp. 96-111, 130.
[9] Exhibit 3 at p. 24.
[10] Exhibit 4, the Master Prison of Henry Leonard.
[11] Exhibit 5, Excerpt of Deposition of Secretary James LeBlanc, at pp. 29 ; Exhibit 6, Excerpts of Deposition of Warden Burl Cain, at pp. 26-31; Exhibit 7, Department Regulation No. B-08-013
[12] Exhibit 8, Department Regulation no. B-08-005 at p. 1.

2

       5) Observance of authorized faith-based diets, holy day ceremonies, work restrictions and authorized communal sacramental rites;

       10) Use of community resources (including volunteers);[13]

In accordance with the directives of the Faith Based Programs and Services of the Department Regulation, DWCC hired Imam Wali of the Al-Islam sect to provide Islamic services to the Muslim community housed at DWCC.[14]  DWCC provides the weekly Jum' mah services on Fridays and the daily Taleem or Ars Salat study program; a non-pork diet, accommodation to allow fasting during the daylight hours for the month of Ramadan, and the Feast of Id.[15]  These services are assisted by inmate Imams. [16]  Muslim offenders are allowed to possess prayer rugs, religious materials and the Qur'an in their housing units.[17]  These religious services are provided to all Muslim offenders regardless of their housing assignment.[18]

While Leonard has at times voluntarily declined to participate in the Islamic programs[19], all of the programs are available to him and special accommodations have been made to encourage the participation of those housed in the protective unit in the faith-based programs.[20]  Leonard has received approximately 60 religious books while incarcerated at DWCC which he asserts have assisted him in his spiritual journey. Several of these publications were published by the *Final Call.*[21] The Department encourages participation in faith based programs.  In fact, in Leonard's 2006 Classification Review, it was noted that he should continue in the Muslim Program.[22]

---

[13] Ibid at pp 3-4.

[14] Imam Wali has retired since the instant lawsuit has been filed but still volunteers at DWCC.

[15] Exhibit 1 at pp 72 -77.

[16] Id.

[17] Ibid. at pp. 61-62.

[18] For disciplinary purposes, those inmates housed in Isolation or cell blocks lose their privilege to attend any function requiring a call-out for the duration of the disciplinary sanction, which includes participation in religious programming.

[19] Exhibit 2 at pp. 56.

[20] Exhibit 8, Excerpts of the Deposition of Terrence Prudhomme, at pp. 23-24.

[21] Exhibit  2, Excerpts of the Deposition of Henry Leonard, at p. 56.

[22] Exhibit 9

3

The only act the Department or any of the Defendants have taken to limit Leonard's religious experience is to reject *The Final Call* newsletter, an official publication of NOI.  This predominantly political publication was not denied because it espoused the NOI religion but, because of security concerns of some of the included articles.  The Southern Poverty Law Center ("SPLC") publishes a quarterly Investigative Report which lists what it deems to be "hate groups"; NOI is included on that listing.  SPLC categorizes NOI as a "black separatist" and a "black supremacist group".[23]   The Anti-Defamation League has found NOI to be racist and anti-Semitic. [24] The racially discriminatory and provocative nature of some of the articles contained in the *Final Call,* have raised security concerns for the Department.

The Department rejects any publication that is considered racially inflammatory pursuant to Department Regulation, policy and practice.  A publication can be refused and withheld from an offender if the procedures outlined in Department Regulation No. C-02-009 are met.   These procedures include:

> B.  Refusal of Publications:  Printed material shall only be refused if it interferes with legitimate penological objectives (including but not limited to deterrence of crime, rehabilitation of inmates, maintenance of internal/external security of an institution or maintenance of an environment free of sexual harassment) or if the refusal is necessary to prevent the commission of a crime or to protect the interest of crime victims.  This would include but not be limited to the following described categories:
> * * *
> 5)  The printed matter contains material which, reasonably construed, is written for the purpose of communicating information which could promote the breakdown of order through inmate disruption, such as strikes or riots or instigation of inmate unrest for racial or other reasons; [25]

---

[23] Exhibit 10, Southern Poverty Law Center's Active Hate Group Listing, Exhibit 1@ p. 15.
[24]  Exhibit 11, Anti Defamation League article
[25] Exhibit 12, Department Regulation C-02-009 effective June 14, 2002 with modification of Page 9 on November 14, 2003 at pages 8-9.

4

As an awareness of homegrown terrorist threats via "prison Islam"[26] became more identifiable, the Department engaged in a thorough overhaul of its regulations and policies concerning inmate publications and mail.  Department Regulation C-02-009 was revised and became effective January 5, 2007 through emergency promulgation[27], and included as grounds for refusal of a publication the following security issue:

> "f.     ...Racially inflammatory material or materials that could cause a threat to the inmate population, staff and security of the facility;" [28]

Also included in the revision of Department Regulation C-02-009 was a classification of regularly received publications: Category 1 includes publications that are presumptively rejected, Category 2 includes publications that require that each issue to be reviewed for compliance with the Department Regulation, and, Category 3 includes those publications that are presumptively accepted. [29]

The *Final Call*  has been placed in Category 2 because "The Muslim Program"[30] is contained on the last page of every *Final Call* issue and because "The Muslim Program" has been found to be racially inflammatory and in violation of both versions of the Department Regulation governing inmate publications. Warden Burl Cain wrote NOI requesting a "Corrections Version" of the *Final Call*.[31]  It was hoped that a *Final Call* version that omitted "The Muslim Program" would permit some, if not all, issues to be received by inmates in the Department's custody.  No response was ever received from NOI, and the publication has been rejected consistently for being racially inflammatory and a threat to security.

---

[26] "Prison Islam" is the term used by law enforcement agencies when discussing the radicalization of the Islamic faith in prisons.
[27] Exhibit 13, Correspondence from Secretary Richard Stalder to the Honorable Joe R. Salter, Speaker requesting emergency promulgation of Department Regulation C-02-009 and the justification thereof.
[28] Exhibit 14, Department Regulation C-02-009 effective January 5, 2007 at p. 11.
[29] Ibid.  Attachments E,F, and G of Exhibit 13
[30] Exhibit15, The Muslim Program as printed in each edition of the *Final Call*.
[31] Exhibit 16, Correspondence from Warden Burl Cain to NOI regarding a Corrections Version of the *Final Call*.

5

The Department has sound penological interests in rejecting the *Final Call.* Increasing racial tensions among persons who must live, eat, sleep and work together in one unit presents an untenable position that is wrought with potential problems leading up to and including violence. The faith based programs and change in management styles has resulted in a marked decrease in violence within the prison system. As a result of the changes, the number of violent crimes has dropped at Louisiana State Penitentiary, ("LSP"), from a total of 1,318 in 1998 to a total of 376 in 2008.[32] The Department desires to continue this trend.[33]

Racial supremacy literature is prohibited within the institutions of the Department. Materials including the *Klansman Handbook* and the *Aryan Warrior* are routinely rejected, again not for religious reasons, even though the literature is published by the Church of Jesus Christ Christian Materials or American Institute of Theology, but because these inflammatory publications pose a threat to security.[34]   To grant injunctive relief to the Plaintiff and allow the distribution the *Final Call* into the institutions of the Department would allow all racially inflammatory material into the prison system.[35] The Department has legitimate penological interests in rejecting the *Final Call.* Leonard retains the right to practice his religion without receipt of the *Final Call.*

**II. Standard of Review**

*A.     Summary Judgment Standard of Review*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. By its very terms, this standard provides that the mere existence of some alleged

---

[32] Exhibit 17, Louisiana State Penitentiary Statistics. Louisiana State Penitentiary was the first institution to start the faith based program and this has a longer tracker period for statistical purposes than DWCC.
[33] Exhibit 6 at pp.32, 137-138.
[34] Exhibit 13, Attachment F; Exhibit 18, Defendants' Third Set of Responses to Interrogatories
[35] Equal Protection claims would erupt if the Department allowed the distribution Black Supremacist publications but denied the White Supremacist materials. Exhibit 1 at pp. 34-37.

factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.* 477 U.S.242, 247-248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc. 477 U.S. at 248.*

The Defendants in this matter satisfy their initial responsibility in moving for summary judgment by informing the Court of the basis for their motion through the pleadings in the record, the attached Statement of Undisputed Facts and the Exhibits attached to the Motion herein, which demonstrate the absence of any genuine issue of material fact as the Plaintiff's ability to exercise his right of religion.

B.   *Standard of Review for Free Exercise of Religion Claims*

The 5th Circuit Court of Appeals explained the standard of review for the free exercise of religion in a penal institution in *Chriceol v. Phillips,* 169 F. 3d 313, 316 (5th Cir. La., 3/24/1999):

> *In O'Lone v. Estate of Shabazz,* the Supreme Court established the test for evaluating the constitutionality of regulations that infringe on a prisoner's First Amendment Rights. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological inters. To determine whether a challenged regulation is valid, we are directed to four factors relevant for determining whether a challenged regulation is valid: (1) whether the regulation has a logical connection to the legitimate government interests invoked to justify it; (2) whether there are alternative means of exercising the right that remain open to the inmates; (3) the impact that accommodation of the asserted constitutional rights will have on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at de minimis cost to a valid penological interests. (Interior citations and quotations have been removed.)

The 8th Circuit further explains that, "Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system.

7

Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting." *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 982 (8th Cir. 6/22/2004). Leonard's right to exercise freedom of religion claims, therefore, should be evaluated under the *Turner v. Safely* factors explained in *Chriceol* and *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459(1989).

## III.   ARGUMENT

### A.   *All Inclusive Islamic Services*

During the course of discovery in the instant case, it appears that the Plaintiff has attempted to amend his complaint to add a new claim or cause of action for the purported denial of religious freedom for the failure of the Defendants to provide separate and distinct services for members of the Nation of Islam sect of the Islamic faith.   The Defendants vehemently object to any such expansion of the initial Complaint. (Rec. doc. 1).   Furthermore, this claim was not included in administrative remedy request DWCC- 2006-0647 [36] and, as such, this Court has no subject matter jurisdiction to hear this claim as the Plaintiff has not exhausted his administrative remedies concerning this new cause of action.   42 U.S.C. § 1997e(a); *Days v. Johnson,* 322 F.3d 863, 866 (5th Cir. 2003).

If the Plaintiff is attempting to use the lack of separate worship service*s* as support for his claim that denial of the *Final Call* is the only method in which he can pursue his religion, the Defendants respond as follows.   Because of finite resources, and because of space limitations, the Defendants have made a policy decision to offer religious services to the broad faith groups i.e. Roman Catholic, Protestant, Jewish, Islam, etc.   No group is allowed to have services for just one

---

[36] Exhibit 18, Administrative Remedy DWCC-2006-0647

denomination or sect, but services must be open to any inmate who may wish to participate in the service or religious program. [37]

Ray Anderson is the Chaplain for DWCC. Part of his duties in executing the chaplaincy program is to encourage and solicit support (volunteers, materials, etc.) from people of all denominations to assist in providing a wide spectrum of religious services at DWCC. This attempt at diversity is hampered in some ways as north Louisiana, the locus of DWCC, has a large Protestant, primarily Baptist population. Chaplain Anderson attempts to limit the volunteers and services provided by this group to ensure time, space and resources are allotted to other denominations. Currently the following religious groups are providing services to DWCC: Roman Catholic, Nondenominational Protestant, Independent Baptist, Southern Baptist, Pentecostal, Charismatic, Al-Islam, Jewish. The American Indian and Wicca religions are practiced by self-observance as volunteer facilitators have not been forthcoming or available.[38] Examples of the daily activities provided at DWCC by the Chaplaincy Program are contained in Exhibit 20.

Al-Islam provides all of the Muslim religious services at DWCC. Imam Wali was hired to provide these services and he assists in providing volunteers and religious materials for the Muslim offenders housed at DWCC. Warden Goodwin estimates that approximately thirty-five offenders, or two percent (2%) of the DWCC inmate population have declared themselves to be of the Islamic faith. [39] Chaplain Anderson states that sixty (60) inmates have requested special non-pork religious diet trays for the month of May. He estimates that approximately thirty (30) offenders are active participants in the Muslim services.[40]

---

[37] Exhibit 19, Affidavit of Chaplain Ray Anderson
[38] Exhibit 19. Affidavit of Chaplain R. Anderson
[39] Exhibit 1 at p 77.
[40] Exhibit 19. Currently DWCC does not house anyone who has declared himself to be Jewish so the religious diet requests reflect only Muslim inmates.

9

Leonard testified that he has received from *The Final Call Publishing Company* three books that were helpful for his spiritual journey:

> The Holy Qur'an is the key to all Muslims around the world no matter what sect, and I had a prayer book would help me expand and help me say my five prayers per day in Arabic, and the cassette from the Nation of Islam was actually a cassette teaching of the prayer that was recited, and I would learn how to speak Arabic in my prayers by listening to the cassette and try to memorize how to speak it properly. [41]

Leonard also received the following books that assisted in his spiritual journey from the *Final Call* and other publishers:

> *Gnostic Gospels, The Complete Dead Sea Scrolls, the Nag Hammadi Library, The Hiram Key, Gospel of Mary, In Search of Zarathustra, The Kabala, Read and Speak Arabic for Beginners, Freemasonry and its Etiquette, Dictionary of Freemasonry, Manual of Habit, Life of Muhammad, The Scriptures, English-Arab Dictionary, Josephus, Unseen Hand, Simple Guide to Prayer, Destruction of Black Civilization, African Original of Civilization, Secret Teaching of All Ages, From Babylon to Timbuktu, Dead Sea Scrolls Uncovered, Science and Theology Vols. I and II, Herodotus: the Histories, The Secret Relationship Between Blacks and Jews* (another book published by the Final Call), *Muslim Prayer Book, Astrological Foundation for the Christ Myth, Holy Qur'an* (another translation), *The Essenes and Jesus, Guidance from the Messenger The Jewish Study Bible, Kebra Negost, The Book Your Church Doesn't Want Your to Read, The Africans Who Wrote the Bible, The Honorable Elijah Muhammad, Understanding of the Holy Scriptures,* five cassette tapes from the Nation of Islam, *History of Nimrod, Who Created Christmas, the Origin of Christmas, The Natural Genesis, The Egyptian Religion, Dictionary of the Holy Qur'an by W. Dean Muhammad, Book of Thoth, Sex and Race, Vols. I, II, III, and The Book of the Going Forth by Day.* [42]

In addition to receiving unlimited religious publications, the Hope Chapel displays Al-Islam religious materials for use by inmates[43]. Leonard had previously given his profession of faith prior to incarceration and he stated that "you are Muslim wherever you go"[44], so that he did not repeat this 1st Pillar of the Muslim Faith. He is able to take his daily prayers, have a prayer rug and participate in the daily study group, though he voluntarily chooses not to participate in the study

---

[41] Exhibit 2 at p. 47.
[42] Ibid at pp. 39-63.
[43] Exhibit 1 p. 57, Exhibit 2 p. 88.
[44] Ibid at pp. 80-81

10

group.[45]  He chooses not to participate in the Jummah or Ta'Lem services which are available to Muslim inmates.[46]  He can partake in the third Pillar of the Muslim faith which is charity.[47] Ramadan is offered to all Muslims housed at DWCC.   Leonard chooses not to participate in Ramadan as he claims that NOI Ramadan is celebrated at a different time than celebrated by the orthodox Islam religions such as Al-Islam.[48]  Ava Muhammad, spokesperson for the NOI, stated that in 1985, NOI began celebrating Ramadan at the same time as the orthodox Islamic sects.[49] (This change was made prior to Leonard being incarcerated.) The fifth Pillar of the Islamic faith is to make a pilgrimage to Mecca if possible.  Leonard obviously will not be able to complete this Pillar of his faith.  DWCC has afforded Leonard all of the available opportunities to partake in the basic tenets of his faith.  Leonard has decided to participate in some and to forego others solely of his own choice.

Ava Muhammad clarified the relationship between the orthodox Islamic sects and NOI by attesting:

> A. [W]e are Muslims.  Now we may be characterized by someone or person or persons as a sect; but no, we are Muslims.  We follow Islam.
>
> Q. And as members of the Nation of Islam, you believe in the Five Pillars of the Islamic faith?
>
> A. That is correct.  Every thing that is contained in the Holy Qur'an we follow.  And we believe in the sayings of Prophet Muhammad.  We follow the tenets of the religion of Islam. [50]

She further explained that the NOI "practice[s] Ramadan according the lunar calendar along with the entire world of Islam." [51]  The NOI follows Islamic law. [52]

---

[45] Ibid at p. 82.
[46] Ibid at 84.
[47] Ibid at pp. 103.
[48] Ibid at pp. 104.
[49] Exhibit 3 at p. 100.
[50] Exhibit 3 at p. 98.
[51] Ibid at p. 100.

11

Despite NOI following Islamic law and the Holy Qur'an, Ms. Muhammad noted that the major difference between NOI and the orthodox Islamic faiths is that NOI believes that Allah became manifest in Master Fard Muhammad. [53]

No NOI materials or volunteers have been offered to DWCC. Ms. Muhammad stated that NOI has developed approximately thirty-one (31) study guides that are used at the NOI Mosques.[54] When asked if she would like to donate some to the institution, since the Department is prohibited from buying any religious materials, she stated they would look into it.

LSP, has a larger Muslim population than DWCC. Imam Yusef Abdullah is the Muslim chaplain on staff at LSP. He states that NOI inmates regularly participate in the Al-Islam religious programs and services at LSP.[55] He further stated that a NOI member was the past president of the Students of Islam inmate organization, which is a position voted upon by the entire inmate Islamic community.[56] Imam Yusef also testified that as part of his chaplaincy duties, he arranged on several occasions to have NOI members come to LSP to preach and teach. NOI's participation tapered off when the NOI volunteers showed more interest in organizing a group at LSP as opposed to the invited purpose of teaching. [57] LSP has never received any donations of materials from NOI.

The question then becomes whether the denial of separate Islamic services for the NOI is an unlawful impingement upon Leonard's right to exercise his religion. Using the *Turner v. Safely,* 107 S.Ct.2254, 482 U.S. 78, 96 L.Ed.2d 64 (1987), factors explained in *Chriceol* and *Thornburgh v. Abbott,* the answer must be no; Leonard has been given a reasonable opportunity to practice his religious beliefs, with or without the publication of the *Final Call.*

---

[52] Ibid at p. 99.
[53] Id.; Exhibit15 at point #12 in What Muslims Believe.
[54] Exhibit 3 at p. 13.
[55] Exhibit 21, Exhibits of Yusef Abdullah at p. 9.
[56] Ibid. at p. 67-68.
[57] Ibid at p. 66, 70.

12

While an inmate retains the ability to freely practice their religion, the "reality of incarceration and the inherent conflict with various legitimate penological objectives, their constitutional protections are considerably more circumscribed than those of the general public." *Powell v. Estelle,* 959 F.2d 22 (5th Cir. 1992). The Department has limited the practice of the Islamic faith to the Al-Islam sect. Protestantism is likewise limited; every denomination does not get its own separate meetings. This restriction is to ensure that all inmates are afforded access to the basic tenets of religion of their choice. Warden Goodwin testified that the multi-denominational Hope Chapel is booked for religious activities seven (7) days a week. [58] As Warden Cain testified the faith based programs are a key component to the rehabilitation of those committed to the Department's custody. [59] The goal to expose as many inmates as possible to the faith of their choice is a legitimate penological goal.

Leonard is able to exercise this rights that remain open to him. NOI is an Islamic faith. He has Islamic ministers available for spiritual consultation, he can participate in the Jum'mah and Ta'Lem services, he can participate in the daily study group, he can receive religious publications to further his studies, he can participate in Ramadan and the Five Pillars of the Islamic faith, he can elect a non-pork diet. These opportunities were found to be sufficient by the Middle District Court of Louisiana in failing to find a constitutional violation of an inmate's right to exercise his religion. Please see *Michael Williams, et al v. Warden Burl Cain, et al,* (Civil Action No. 95-1920-A-1, M.D. La. 7/28/1998) (Separate services for Nation of Islam were not required.); *Edwin Codrington v. Richard L. Stalder,* (Civil Action No. 06-5-JJB-DLD, M.D. La. 5/5/2007) (denial of certain Islamic publications); *John Fuller v. Richard Stalder (Civil Action No. 99-679-B-3, M.D. La. 2/23/2001)* (denial of separate worship services for Satanist). Religious programs cannot be provided for one

---

[58] Exhibit 1 at p. 75.
[59] Exhibit 6 at p. 136-138.

13

individual only. No one is certain of the exact number NOI inmates at DWCC. Regardless of the exact count, it is a de minimis portion of the fifteen hundred plus inmates housed at DWCC. The alternative means provided to Leonard to exercise his religion, in conjunction with Al-Islam, satisfy the *Turner* inquiry.

B.      *Security Concerns Justify the Rejection of the Final Call Magazine*

> *Men never do evil so completely and cheerfully*
> *as when they do it from religious conviction.* [60]

An additional concern in determining which Islamic faith to offer at the Department, besides the availability of volunteers and resources, is the issue of security. Al-Islam is an orthodox Islamic faith, recognized by the International Islamic Community, devoted to peace, and open to all races, genders and national origins. [61] In recent years, greater security concerns have been raised by the Federal Bureau of Investigations and the U.S. Department of Homeland Security concerning the radicalization of prison Islamic groups becoming potential homegrown terrorists. The first identifiable correlation occurred with the JIS group that was formed in the California Department of Corrections.[62] The FBI warns that, "In prisons, extremist recruiters can identify a population disaffected with society and their operational skills and propensity for violence to further their cause."[63] Col. Eric Sivula, the Department's representative to Homeland Security and the FBI, testified that a concerted effort has been made by the federal agencies to include and incorporate state correctional facilities in the attempt to curb and perhaps prohibit the growth of the "prison Islam" groups.[64] While the Department does not assert that the NOI is a radicalized Islamic group,

---

[60] By Blaise Pascal as quoted in The Shack, by Wm. Paul Young (Windblown Media, Newbury Park , Cal., 2007) at p.172
[61] Exhibit 21 at pp. 64. Yusef Abdullah
[62] Robert S. Mueller, III Director of Federal Bureau of Investigation, "Statement Before the Senate Select Committee on Intelligence" February 16, 2005 and January 11, 2007.
[63] Exhibit 23, FBI Law Enforcement Bulletin, December 2007 Volume 76, number 12.
[64] Exhibit 24, Excerpts of the Deposition of Eric Sivula at pp. 44.(include his credentials page)

14

the Department does have a valid penological goal in limiting the number of Islamic sects allowed into the prisons.

The Department does find, however, the NOI publication entitled *The Final Call* to be racially inflammatory and to be prohibited by both the 2002 and 2007 version of Department Regulation, C-02-009.[65] This Department Regulation was written "to establish the Secretary's policy regarding inmate mail privileges, including publications at all adult institutions." [66] The Regulation was expanded and updated in 2007 but the mission remains the same. The Department has defined several types of publications as being a threat to the security of the institution, by either creating risks or opposing rehabilitation efforts.[67] For example, sexually explicit material is rejected throughout the institution because it can increase attempts of nonconsensual sex and/or countermand the teachings and/or progress made in sex offender therapy.

All mail into or out of an institution is read or screened by the mailroom personnel at each institution.[68] If the reviewing officer feels that a certain publication or letter is in violation of Department Regulation C-02-009, the officer will bring the publication to the Mailroom Supervisor's attention. If the Mailroom Supervisor concurs, the publication is then sent to the Warden of the institution to review. If the Warden finds the publication to be questionable or in violation, then the Warden sends the publication to the Regional Wardens for review. If all the Regional Wardens unanimously agree, then that particular issue of a publication is rejected at all institutions within the Department.[69]

---

[65] See Exhibts12 and 14.
[66] Exhibit 14, page 1.
[67] Exhibit 6 pp. 16.
[68] Exhibit No. 24, Excerpts of the Deposition of M/Sgt. Isaiah, p. 9.
[69] Either in Burl, Jimmy's or Jerry's depos maybe all 3. Exhibit 1 – Jerry Goodwin, Exhibit 5 James LeBlanc @ pp. 12-13, Exhibit 6 @ pp. 8-9, pp. 30-33.

15

While the presumptions contained in Department Regulation, C-02-009, exist to assist the mailroom staff, each publication is reviewed for content. For example, while the magazine *Maxim* is on the presumptively acceptable list, one issue contained an article on how to "pick" handcuffs; and that article was deemed to be a threat to security. That particular issue of *Maxim* was rejected department-wide.[70]

*The Final Call* has been screened by the Regional Wardens and placed in Category 2. Every issue of the *Final* Call since the commencement of the screening process[71] has been rejected as being a threat to security, specifically as containing racially inflammatory material.[72] Each edition of the *Final Call* contains "The Muslim Program".[73] This is a statement of what members of the NOI want and believe. The specific objectionable portions are contained in the correspondence by Warden Cain to NOI requesting a "corrections version" of *The Final Call.*[74] In summary, through "The Muslim Program", NOI asserts that the races should be separated and that separate state or territory being given to the blacks of America. Because of this tenet, the Southern Poverty Law Center and others have labeled NOI as "black separatists." "The Muslim Program states in part:

> 9. WE BELIEVE that the offer of integration is hypocritical and is made by those who are trying to deceive the black peoples in to believing that their 400 year old open enemies of freedom, justice and equality are all of a sudden their "friends". Furthermore, we believe that such deception is intended to prevent black people from realizing that the time history has arrived for the separation from the whites of this nation.

> If the white people are truthful about their professed friendship toward the so-called Negros, they can prove it by dividing up America with their slaves.

---

[70] Deposition of Jackie Hamil, Exhibit 32.

[71] The screening process started prior to the enactment of 2007 version of the Department Regulation and codified the procedure. (See Exhibit 25, Excerpts of Deposition of Venetia Michael, at pp. 60-62.)

[72] Exhibit 12 at p. 9 B. 5). Exhibit 14 at p. 11 C (1) f.

[73] Exhibit 15.

[74] Exhibit 26. See also Exhibit 6 pp. 53-59.

16

When asked why Warden Cain found this statement to be racially inflammatory and why he considered racially inflammatory material to be a threat, he replied:

> If one race calls the other names.  If one race implies I don't like you because you did this to me, you treated me bad, you've been mean to me and I don't like it. Or if I advocate separation, I don't want to be with you, you don't need to be with me.  We're not going to be together.  I can't put them in a dormitory and let them live in a double bunk one over the other one.
> * * *
> In prison it's imperative that we peacefully coexist.  We're confined, we're forced to stay together. We're forced to eat together.  We're forced to sit together. We're forced to be together. So, therefore in a prison environment we can't afford any of this separation.[75]

As Warden Cain explains, the majority of the points made in "The Muslim Program" are racially divisive; a clear separation of races is advocated.  That type of approach is opposite to the penological interests of the Department.[76]  Warden Cain summed up the Department's purpose by saying, "We have to be integrated; we have to be one America. . . [L]et's leave race out of our lives in prison."[77]

Warden Cain states that there hasn't been any racial conflict in a long period of time at LSP or at any of the prisons within his region.   These results are from being proactive instead of reactive; of insisting that all inmates get along; by denying the right to be in gangs or any type of grouping that separates one from another.  As a result, the violence at LSP has dramatically decreased.  Again, the preventing of racial divisions and inflammatory speech are legitimate penological interests.

Ava Muhammad explained that while "The Muslim Program" was written in the 1930s, "The Muslim Program" contains the beliefs of the members of NOI today. [78] "The Muslim Program" conforms to other practices and written materials of the NOI.  Henry

---

[75] Exhibit 6 at pp. 39-40.  See also pp. 49- 52, 53-.79.
[76] Id.
[77] Ibid at p. 79.
[78] Exhibit 3 at pp. 43, 53, 74.

Leonard stated that prior to becoming a member of the NOI he was required to answer questions based upon study guides.[79]  Ms. Muhammad confirmed that the questions and study guides attached hereto as Exhibit 27 are the guides used by Leonard and are still being used.[80]  In the study guide the following "Student Enrollment Lesson" is presented:

1.    Who is the original man?
Answer:  The Original Man is the Asiatic Black Man, Owner, Maker, cream of the planet Earth, God of the universe and Father of Civilization.

2.  Who is the colored man?
Answer:  The Colored Man is the so-called white man or Caucasian, Yacobs grafted devil, skunk of the planet Earth.[81]

34.  And can you reform devil?
Answer:  No.  All the prophets have tried to reform him (devil) but were unable, so they have agreed that it cannot be done unless we graft him back to the original man which takes six-hundred years.  So instead of losing time grafting him back, they have decided to take him off the planet, who numbers only one to every eleven original people.[82]

Based upon these beliefs, it now becomes clear why in "The Muslim Program" separation of races is encouraged and interracial marriage or race-mixing is prohibited by NOI.

Even if "The Muslim Program" was omitted from the *Final Call*, each edition would need to be reviewed, as per Department Regulation, because other articles may contain racially inflammatory articles.  Two examples of articles which would cause the rejection are, "As a man soweth, the same shall he also reap"[83] and "America's New Slavery: Black Men in Prison". [84] Despite Ms. Ava's Muhammad's assertions that these articles are factual, the same term she used to describe the study sheets referenced above, the Department would reject an issue of the *Final Call*

---

[79] Exhibit 2 at p. 42.  Exhibit 3 at pp. 120-121.
[80] Exhibit 3 at p. 119-121.
[81] Exhibit 27 at p. 70.  See also Ms. Muhammad's description of Yacob in Exhibit 3 at pp. 121-124.
[82] Ibid at p. 83.
[83] Exhibit 28 by the Honorable Minister Louis Farrakhan, last updated January 7th, 2009. Ms. Muhammad attested that the articles found on the website are also contained in the publication.  Exhibit 3 at p. 139.
[84] Exhibit 29 by Charlene Muhammad, Staff Writer last updated March 20, 2008.

18

containing these articles as they promote unrest and are a threat to security. In the first article, Mr. Farrakhan asserts that:

> When Hurricane Katrina struck; some said that they busted the levees; I do not know how true that is, but I know that White people have done worse than that.
>
> The youth today do not know anything about this enemy, because grandparents did not tell their children about the evil of the people that we have been living among in this country. So the youth think it is a party going on and you think they have changed.
>
> ***
> These are the people who plan death and destruction to further their political and economic ends- don't you know that yet?

Besides being highly racially inflammatory, the Department was in a state of crisis immediately following Hurricane Katrina. Parish prison inmates were transported to Department institutions statewide, quarters were tight, anxieties were high. Adding this type of accusation into the mix would have been like throwing a fire bomb into the prison setting. Col. Sivula testified, "[W]e could have had a real serious pr[oblem] if, in fact, inmates believe that they were put at risk or their families were put at risk by some intentional act based on race."[85]

The second illustrative article, entitled "America's New Slavery: Black Men in Prison" violates almost every penological goal of the Department. Rehabilitation cannot take place until responsibility for the criminal action is taken. If the offender is given an excuse of race, he doesn't have to examine his own personal responsibility for his crime. Secondly, the article infers that primarily blacks are imprisoned to be put to work like their forefathers by slave masters. Again, this is racially inflammatory and divisive. The article continues with the following, which could create irreparable strains between the correctional officers and the inmates:

> A new American slave trade is booming, warn prison activists, following the release of a report that again outlines outrageous numbers of young Black men in prison and increasing numbers of adults undergoing incarceration. That slave trade is connected

---

[85] Exhibit 30, Excerpts of the Deposition of Col. Eric Sivula at p. 51. (put in pp 46- 51)

to the money states spend to keep people locked up, profits made through cheap prison labor at for-profit prisons, excessive charges inmates and families may pay for everything from tube socks to phone calls, and lucrative cross country shipping of inmates to relieve overcrowding and rent cells in faraway states and counties.

\* \* \*

[T]he majority of prison costs support guard unions and pay enormous base and overtime salaries of prison guards and other staff. They receive these exorbitant wages regardless of their education and training. You don't have an I.Q.; all you have to have is the ability to be brutal to command these wages through this new slave system.[86]

This Court reviewed the issue of rejection of publications in a prison previously in *Brown v. Ridge*.[87] This Court advised:

> [T]he test regarding a prison regulation allowing prison officials to reject incoming publications found to be detrimental to institutional security is whether it is reasonably related to a legitimate penological interest. *Chriceol v. Phillips,* 169 F.3d. 313, 315-317 (5th Cir. 1999). Before delivery of a publication may be refused, prison administrators must review the particular issue of the publication in question and make a specific factual determination that the publication is detrimental to legitimate penological interest. *Guajardo v. Estelle,* 580 F.2d 748, 762 (5th Cir. 1978).[88]

The Department has reviewed, discussed and stated the penological reasons for the rejection of each edition of the *Final Call* which contained "The Muslim Program".[89]

This Court continued and stated:

> The Fifth Circuit has held that restrictions on certain material that has the **potential** to produce violence are rationally related to the valid penological interest of insuring the safety of prison inmates. *Chriceol.* Violence-producing material may include, *inter alia*, material that would encourage inmates to strike or riot, material that would encourage racial or religious hatred [.] . . . A prison regulation may validly restrict material advocating racial hatred on the basis that it would **create a serious danger of violence.** *Chriceol.*

> \* \* \*

[86] Exhibit 29 pp. 1-2.
[87] 2006 WL 15811167 (W.D.La. 1/19/2006.)
[88] Ibid at p. 13; interior quotation marks omitted.
[89] Exhibit 25, at pp. 38-60. Also see Exhibit 5 pp.20- 28 and Exhibit 31, 6//06 email from Venetia Michael to the other Regional Warden regarding the *Final Call* with attachments.

20

> Central to all other goals is the institutional consideration of internal security within the corrections facilities themselves. *Pell v. Procunier,* 417 U.S. 817, 823 (1974). The security of both inmates and prison employees is a valid penological goal. *Hicks v. Garner,* 69 F.3d 22, 25 (5th Cir. 1995). Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Whitley v. Albers, 475* U.S. 321, 321-22, 106 S.Ct. 1078, 89L.Ed.2d 251 (1986).[90]

The Eighth Circuit reasoned that, "Racial separatism may certainly be more inflammatory and a greater security concern when it is mandated by the dogma of a particular religion than when it is a factual result of a particular ideology." *Murphy v. Missouri Department of Corrections,* 372 F.3d 979, 987 (8th Cir. 6/22/2004.) Because of the intertwining of religious, political and social articles in the *Final Call,* the security risks to the prison are heightened. While no actual violence can be traced solely to the admission of the *Final Call* into the Department, the potential threat of violence is increased because of the nature of the publication. The Supreme Court held that publications can present a security threat, even if they did not lead directly to violence because they can exacerbate tensions and lead indirectly to disorder. *Thornburgh v. Abbott,* 490 U.S. 401, 416, 109 S.Ct. 1874, 104 L.Ed. 2d 459. "A regulation that allows for censorship of incoming items that are likely to incite violence is related to the institutional needs of maintaining a controlled and secure environment among the prison population." *Murphy v. Missouri Department of Corrections* at p. 988.

Suggestions as to how to limit the restriction on Leonard's right to receive publications have been implied including that since Leonard lives in the protective unit at DWCC, apart from the general population, no threat would be cause by Leonard receiving the *Final Call.* The Department Regulation at issue, C-02-009, is directed at the entire inmate population regardless of their housing assignment; variances are not made for a protective unit as opposed to general population. Further,

---

[90] Ibid at pp. 13-14. (Emphasis added.)

21

Terrence Prudhomme, another inmate housed in the protective unit, recalls that when the *Final Call* was previously admitted at DWCC, the magazine was often found in the television room of the protective unit for any offender to view. *As* the Supreme Court explained:

> We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about the fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly. ... The problem is not in the individual reading the material in most cases. The problem is in the material getting into the prison. [91]

Another suggestion has been made to tear out "The Muslim Program" from each *Final Call* issue. This is not a tenable solution. The Department does not have the manpower to tear out each objectionable page from a publication. If this solution is enacted for *The Final Call*, all affected publications will have to be treated similarly.[92] Further, the redaction would permanently destroy the publication. Currently the inmates have the option to appeal the rejection and the objectionable page is used as evidence and/or to send the unaltered publication to a family member or friend. The Department has made the decision to reject the entire publication and allow the inmate to make the decision regarding disposal. *Turner v. Safley* does not require the Department to utilize "a least restrictive alternative test" and the "courts must accord deference to a prison's choice of regulations employed to implement valid penological goals." *Shabazz v. Parsons,* 127 F.3d 1246, 1249.

The security concerns surrounding the *Final Call* outweigh Leonard's right to receive this particular publication. He can and does receive other publications including other publications from *Final Call* publishing. He is not restricted from practicing the basis tenets of his faith. The *Final Call* should be rejected in its entirety without redaction, as was its predecessor *Muhammad*

---

[91] *Thornburgh* at p. 412-413.
[92] See Answered by Venetia, Exhibit 33 @ pp. 60, also answered by Cain, Exhibit 6, pp. 119.

22

*Speaks,*[93] for creating the threat of violence by advocating racial, religious or national hatred. *Shabazz, supra.*

C.    *Punitive Damages*

Leonard seeks punitive damages against Col. Jackie Hamil, the Mailroom Supervisor at DWCC at the time of the initial rejection of the *Final Call*, and against Venetia Michael, the Warden of DWCC at the same period of time.   Punitive damages can only be assessed if Leonard proves that Hamil and Michael in their individual capacities showed reckless and callous indifference to Leonard's federally protected rights.   *Knox v. City of Monroe,* WL#936965 at p. 1(W.D. La. 4/6/2009). "Reckless or callous indifference requires recklessness in its subjective form, that is a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Knox* quoting *Williams v. Kaufman Cty.,* 352 F.3d 994, 1015 (5th Cir. 2003). (Interior quotations omitted.)

Hamil made no decisions regarding the rejection of any publication including the *Final Call.* He lacked the authority to make any such decision.  If a questionable publication was brought to his attention he sent the publication up the chain of command and the Regional Wardens made the final decision as to rejection.  As he made no decision, he cannot be found to have displayed reckless or callous indifference to the constitutional rights of Leonard.[94]

Warden Michael was a Regional Warden and she along with the other two Regional Wardens, Burl Cain and James LeBlanc, were charged with reviewing objectionable publications. Concomitant with this duty, Warden Michael was also engaged in rewriting the Department Regulation regarding Inmate Mail and Publications, C-02-009.   To perform these duties, she reviewed articles published by the American Correctional Association, ("ACA") regarding this

---

[93] See Exhibit 3 @ pp. 74.
[94] Exhibit 32, Excerpts of the deposition of Col. Jackie Hamil at pp. 34-35.

issue, all applicable ACA standards governing same, the regulations of other state correctional systems and current case law. [95]  Based upon her research, her years of experience and her training[96], she made an informed decision that she could limit Leonard's right to receive the *Final Call* for the valid penological objective of promoting institutional security.  As such, she did not act with callous indifference to Leonard's rights.  Both claims for punitive damages should be dismissed.

## IV. Conclusion

The National Institute of Justice sponsored a study of "Terrorist Recruitment in American Correctional Institutions:  An Exploratory Study of Non-Traditional Faith Groups" which was completed in December 2007.[97] This study examined how different state correctional systems were dealing with the possibilities of homegrown terrorist recruitment.  In the Michigan Department of Corrections it was found that the:

> [g]reatest dangers are presented by prisoners who belong to the Moorish Science Temple and the Nation of Islam (including the Five Percent Nation).  With their appeal to a Black Nationalist identity, these groups attract some of the most violent inmates in the system.  According to one administrator, they draw "most of the thugs" in Michigan prisons who become "the major power brokers on the yard."  The problem then transfers to Michigan's black communities, especially low-income areas of Detroit, Pontiac and Flint where Moorish Science and NOI temples have large numbers of ex-offenders in their congregations.[98]

In California, the problems are created by the gang culture.  The gang members are "joining forces under Islamic banners" fighting one another.[99]  The Louisiana Department of Corrections instead has chosen to address this problem by promoting one mainstream Islamic faith, although guest speakers are permitted from any Islamic sect, and prohibiting racial competition or the

---

[95] Exhibit 25 at pp. 87-92.
[96] Exhibit 33, Training records of Venetia Michael.
[97] Exhibit 34.
[98] Ibid at p. 93
[99] Ibid at pp. 106, 112.

alignment into gangs.   The faith based programs are used as rehabilitative and re-entry support tools.   As a result, violence in the Department of Corrections has been dramatically reduced.

Leonard is permitted to practice his faith and enjoy free exercise of his religion.   He is afforded all religious opportunities.   The *Final Call* has been rejected because of the racial hatred and inflammatory material contained therein that carries the potential threat of violence with its very entry into the institution.   The attempt to minimize the threat of violence is a legitimate penological objective.   Summary Judgment should be granted and Leonard's case dismissed with prejudice.

25