## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

**HENRY LEONARD**                                    **CIVIL ACTION NO.    07-0813**

**VERSUS**                                                  **JUDGE WALTER**

**STATE OF LOUISIANA**                            **MAGISTRATE HORNSBY**


## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.   Defendants State the Wrong Standard of Review for Free Exercise Claims ........................... 2

II.  "All-Inclusive Islamic Services" Do Not Meet the Constitutional Standard ........................... 3

III. Security Concerns Do Not Justify the Rejection of *The Final Call* ....................................... 5

   a. "The Muslim Program" is Not a Security Threat  ........................................................ 7

      i. Not Objectively a Threat……………………………………………7
      ii. No History of Problems……………………….…………………….8

   b. The Department Regulation is Facially Invalid............................................................ 8

IV.  Plaintiff is Entitled to an Award of Punitive Damages........................................................ 10

CONCLUSION............................................................................................................... 11

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Chriceol v. Phillips,
169 F.3d 313 (5th Cir. 1999)……………………………………………………………2

Hutchins v. McDaniels,
512 F.3d 193 (5th Cir. 2007)…………………………………………………………..10

Thornburgh v. Abbott,
490 U.S. 401 (1989)…………………………………………………………………...10

Walker v. Blackwell,
411 F.2d 23 (5th Cir. 1969)…………………………………………………...2, 10

Williams v. Kaufman County,
352 F.3d 994 (5th Cir. 2003)……………………………………………………10

**STATUTES**
42 U.S.C.  2000cc……………………………………………………………………..2

## INTRODUCTION

May It Please the Court:

Plaintiff Leonard (hereinafter "Plaintiff" or "Mr. Leonard") submits this Memorandum in Opposition to Defendants' Motion for Summary Judgment.  This matter concerns Defendants' unconstitutional denial of *The Final Call* newspaper to Plaintiff. On April 20, 2009, the parties filed cross motions for summary judgment.  Plaintiff now files this Memorandum in Opposition to Defendants' Motion, which is based on an erroneous characterization of both the facts and the law.

## FACTS

Plaintiff Henry Leonard is a sincere adherent of the Nation of Islam.[1] The Louisiana Department of Corrections has banned the newspaper of the Nation of Islam, *The Final Call*, because of "The Muslim Program" located on the last page of every issue.[2] *The Final Call* is the only publication of the Nation of Islam from which adherents learn about their faith, and from which adherents can obtain information to allow them to order other materials generated by the Nation of Islam. There is no other source for this information.[3] There is absolutely no history of the Nation of Islam in general, *The Final Call* newspaper specifically, or, most relevantly, "The Muslim Program" in particular, ever- ever in the history of the United States of America- being linked to any violence whatsoever. In fact, violence and weapons are absolutely forbidden in the Nation of Islam.[4]  Plaintiff's expert witness, a former Texas Department of Corrections employee

---

[1] Defendants do not contest this fact. Rec. Doc. 45-3 at 6. However, the Defendants do attempt to impugn the integrity of Mr. Leonard by stating that he did not take a new name upon admission into NOI. Id. at 5. This is incorrect. Leonard Depo., Exh. X, at 165-166. However, because Defendants do not dispute the sincerity of Mr. Leonard, Plaintiff will not take up further time of the Court on this issue.
[2] Rec. Doc. 45-2 ¶ 31.
[3] Leonard Depo, Rec. Doc. 47-4-7 at 195. Muhammad Depo, Rec. Doc. 47-8-11 at  166-168.
[4] Muhammad Depo, Rec. Doc. 47-8-11at 23.

1

and general counsel, has reviewed the information offered by the Defendants and concluded that *The Final Call* is not a threat to security.[5] The United States Court of Appeals for the Fifth Circuit has reviewed multiple issues of *The Final Call* newspaper, and concluded that it was no threat to security.[6] After they banned *The Final Call* the Defendants left 15-20 issues in Plaintiff's cell, as well as many articles that he had torn out from back issue. Despite routine shakedowns of his cell, Defendants did not seize the copies, and neither did they create any disruption.[7] These facts aside, the Defendants have banned *The Final Call*.

## ARGUMENT

### I.  Defendants State the Wrong Standard of Review for Free Exercise of Religion Claims

Defendants maintain that the standard of evaluation for Free Exercise Clause cases is the "reasonably related" standard articulated in <u>Chriceol v. Phillips</u>.[8] <u>Chriceol</u> states the standard for first amendment claims, which Plaintiff has mounted. However, Defendants fail to address the fact that Plaintiff has made a claim pursuant to the Religious Land Use and Institutionalized Persons Act, or "RLUIPA," which re-instituted the strict scrutiny test for religious exercise cases brought on behalf of prisoners.[9] The RLUIPA standard has been extensively briefed by Plaintiff in his Motion for Summary Judgment.[10] Due to the failure to even mention RLUIPA in their brief, Defendants misstate the legal standard to be applied by the Court.

---

[5] Martin Expert Report, Exh. 1.
[6] <u>Walker v. Blackwell</u>, 411 F.2d 23 (5th Cir. 1969).
[7] Leonard Depo., Rec. Doc. 47-4-7 at 260-261; Leonard Verification, Exh. 2.
[8] Rec. Doc. 45-3 at 7; 169 F.3d 313, 316 (5th Cir. 1999).
[9] 42 U.S.C.  2000cc
[10] Rec. Doc. 47-2 at 19-25.

## II.  "All-Inclusive Islamic Services" Do Not Meet the Constitutional Standard

Defendants devote a large portion of their Memorandum in Support of the Motion for Summary Judgment to arguing that Plaintiff can practice his religion because he has access to "orthodox," or "al-Islam" services. To be clear, Mr. Leonard is not claiming that he has a right to Nation of Islam services in the N-5 unit of David Wade Correctional Center. He states this in depositions; all of Defendants' cites to cases about access to services are inapposite. Mr. Leonard's claim is that he has absolutely no way to adequately practice his faith without access to *The Final Call*. That the Defendants provide "all inclusive Islamic services" does not cure the constitutional and statutory violation for several reasons.

First, although they overlap in some respects, orthodox Islam is actively contrary to the Nation of Islam, in that they consider the "cardinal principle" of the Nation of Islam to be blasphemy.[11] Therefore, Plaintiff does not receive full spiritual fulfillment by attending an orthodox Islam service because believers of orthodox Islam reject the person he believes to be "the messenger." Saying that an adherent to the Nation of Islam should receive all spiritual fulfillment from attending orthodox Islam services strikes counsel as being like saying that a Christian should obtain all spiritual fulfillment from attending Jewish services; it would not be possible, because the Jewish faith rejects Christ as having been the Son of God. Plaintiff makes this point not to advocate for separate services, but rather to show that he has a very concrete need for *The Final Call.* Just as a Christian who was only offered Jewish services would need additional materials to supplement his faith, so Mr. Leonard needs *The Final Call*. This rationale likewise

---

[11] Muhammad Depo, Rec. Doc. 47-8-11at 96, 160.

applies to all of the time Defendants devote to discussing Mr. Leonard's access to the five pillars of faith; these aspects of his faith are necessary, but they are not sufficient, similar to as the Old Testament would be necessary to a Christian, but not sufficient religious material without also having access to the New Testament.

Second, Mr. Leonard has expressly been forbidden to attend orthodox Islamic services by Chaplain Ray Anderson.[12] Similarly, the Muslim Chaplain at Angola testified that he refused to allow Nation of Islam ministers in, despite the fact that they wanted to come minister.[13] In their Statement of Undisputed Facts, Defendants flatly declare, "the type of Islamic faith practiced at David Wade Correctional Center is al-Islam."[14] This statement is deeply troubling. Mr. Leonard is an adherent of the Nation of Islam. The Nation of Islam shares some beliefs with orthodox Islam, and differs in other regards. Mr. Leonard is not demanding separate services, but is only requesting access to the literature of his faith. Defendants simply cannot mandate what type of religion can be practiced in their facilities. They can limit services, but they cannot require that all prisoners practice a particular sect or creed without running afoul of both the Free Exercise and the Establishment Clauses of the Constitution, as well as RLUIPA.

Finally, it is no answer for the Defendants to recount the number of books that Mr. Leonard has acquired over the course of his incarceration. In fact, in so doing, Defendants actually make Plaintiff's case for him. They assert that he has been able to practice his faith because in the past he has ordered books from *The Final Call* Publishing Company, which everyone agrees is the only source for Nation of Islam materials. As he testified, Mr. Leonard is now unable to order any books or publications

---

[12] Leonard Depo, Rec. Doc. 47-4-7 at 100, 101; Prudhomme Depo, Exh. 3 at 37-38.
[13] Abdullah Depo, Exh. 4 at 65-66.
[14] Rec. Doc. 45-2 ¶ 8.

*The Final Call* Publishing Company, or from the Nation of Islam, whatsoever, due to the banning of *The Final Call*.[15] When Leonard was transferred to lockdown in September of 2008 all of his books and newspapers (including back issues of *The Final Call*) were taken from him.[16]  He has no way to reorder any books about his faith because *The Final Call* is the only source for that information and it is banned. Therefore, Defendants' argument that Plaintiff has sufficient access to practice his religion because he has ordered books in the past mitigates in his favor; those books were taken from him, and he cannot replace them due to the policy at issue in this litigation.

### III. Security Concerns Do Not Justify the Rejection of *The Final Call*

As a preliminary matter, Plaintiff notes that the Defendants engage in obfuscation of the issues in this case in their brief, which muddies the litigation, and possibly distracts the Court from the issue at hand. This case is about the fact that *The Final Call* was banned because of the last page, "The Muslim Program." This was the testimony of Warden Burl Cain, the Defendants' 30(b)(6) expert for publications, who said that he has "no problem" with the Nation of Islam,[17] and that without "The Muslim Program," "by and large" *The Final Call* would be admissible.[18]  Similarly, Col. Eric Sivula, the Defendants' representative to Homeland Security and the FBI, testified that the Nation of Islam is <u>not</u> a "security threat group."[19] Defendants engage in vague overtures that the Nation of Islam may have something to do with al-Qaeda, despite the fact that both

---

[15] Leonard Depo, Rec. Doc. 47-4-7 at 195. Muhammad Depo, Rec. Doc. 47-8-11at 166-168.
[16] Leonard Depo, Rec. Doc. 47-4-7 at 252.
[17] Cain Depo, Exh. 5 at 108-109.
[18] Cain Depo., Exh. 5 at 129.
[19] Sivula Depo, Exh. 6 at 24.

Warden Cain and Col. Sivula flatly stated that they did not.[20] [21] These facts are not disputed.

It is unclear, then, why Defendants spend sizeable portions of their brief discussing "Prison Islam" in general, and quote random documents and texts they attribute to the Nation of Islam. Defendants quote more from outside documents than they do "The Muslim Program."[22] They spend one page on why "The Muslim Program" is a threat.[23] Plaintiff has no way of answering for every single statement ever possibly made by anyone involved in the Nation of Islam, and neither does he have any way of verifying the accuracy or foundation for such information. Second, and more importantly, if what is at issue in this case is "The Muslim Program," Defendants need to limit their discussion to "The Muslim Program." This strikes Plaintiff as "the shiny keys" defense; Defendants attempt to distract the Court with discussions of various Nation of Islam materials and inflammatory quotes that are taken out of context and that have no relationship to "The Muslim Program." Because everyone agrees that "The Muslim Program" in *The Final Call* is the only thing at issue in this case, Plaintiff will confine his analysis to what is actually at issue in this case.

---

[20] Sivula Depo, Exh. 6 at 23; Cain Depo, Exh. 5 at 117.

[21] It is most interesting that the Defendants close their brief with a quote regarding the "threat" of Nation of Islam prisoners. This quote is completely out of context, and, when read in context, helps the Plaintiff. The report that the Defendants quote, titled "Terrorist Recruitment in American Correctional Institutions: An Exploratory Study of Non-Traditional Faith Groups," confirms that the Nation of Islam is a positive force, and that orthodox Islam and the Nation of Islam are precisely what protect the prison from alienated, radicalized prisoners committing violence in the name of religion. The paragraph immediately succeeding the one quoted by Defendants provides that the way to guard against radical versions of Islam becoming a threat to the institution is to hire Nation of Islam chaplains that can guard against such radicalization. This finding directly contravenes Defendants' "all-inclusive Islamic services" approach. Defendants have chosen to do the opposite of what their own report recommends when they have denied Nation of Islam ministers access, and materials. Exh. 7 at 19, 62, 93.

[22] Rec. Doc. 45-3 at 18-20. FCN articles pertaining to hurricane Katrina, the overrepresentation of black men in prison, as well as the student enrollment lessons for the Nation of Islam are not only irrelevant to this case, but also is similar to material that can be found elsewhere in the prison system. Martin Depo., Exh 8 at 72-73, 78-79, 80-82.

[23] Rec. Doc. 45-3 at 16-17.

6

### a.  "The Muslim Program" is Not a Security Threat

### i.  Not Objectively a Threat

There is simply no evidence that "The Muslim Program" constitutes a security threat. A plain reading of the material does not justify banning it, and one must read "The Muslim Program" in its entirety. It is simply not true that it advocates the separation of the races. As Plaintiff has briefed previously, "The Muslim Program" advocates for equality, justice and freedom. It was written in a historical context in which, politically, the United States of America was trying to determine what to do about the fact that thousands of slaves had been freed. Integration was either non-existent or was producing horrendous violence, so "The Muslim Program" provides that if a peaceful solution is not met, descendents from slaves should be allowed to form their own territory. It should be noted that many white Americans were also advocating for political separation after slavery was abolished, resulting in the creation of Liberia.[24] The Muslim Program clearly contemplates that such a territory would be "given" to the former slaves, not that it would be taken, and, additionally, it clearly is contemplating a separate political entity, not any type of separation in prison. Finally, it is obviously offered as a peaceful solution to the conflict of the time,[25] and provides, in bold type, "we recognize and respect American citizens as independent peoples and we respect their laws which govern this nation."[26] Plaintiff beseeches the Court to read Exhibit 11 in its entirety and in context, which is the only rational way it can be read, and the obvious conclusion is that it is a peaceful, creedal document, which absolutely does not advocate any violence or disobedience of

---

[24] Muhammad Depo, Rec. Doc. 47-8-11at 81-85.
[25] "We know that the above plan for the solution of the black and white conflict is the best and only answer to the problem between two people." Exh 11, ¶ 5, "What Muslims Want."
[26] Exh. 11, ¶ 8, "What Muslims Believe."

7

any kind. Any other tortured reading of "The Muslim Program" simply defies the plain meaning of the words contained therein.

### ii.  No History of Problems

When asked whether *The Final Call* is divisive, Henry Leonard explains,

> …this publication has been coming in here for years and years long before I got here, and if it was racially divisive, if someone could conceive of it as racially divisive it would have caused a lot of trouble before I ever entered in on the scene, and so far it hasn't been a problem with "The Final Call" newspaper, and because it hasn't been a problem in the past obviously it is not racially divisive because if it had been I would think that someone in the N5 unit would have written an ARP or they would have said something to authority about it because … when I got here they had "The Final Call" newspaper … displayed under the TV where people could freely get it and freely read it just like they had other Christian publications, and I don't know of one white guy over there that actually complained about "The Final Call" newspaper, and you have people over there that are white that have actually looked at it and read "The Final Call" newspaper to some degree, and they have never complained about it, and they have never written an ARP on it.[27]

The Defendants are unable to point to any incident of violence attributable directly or indirectly to the Nation of Islam. Certainly it is not Plaintiff's position that Defendants could only be reactive; he appreciates that they must proactively prevent threats to security. However, where this exact material has been admitted to hundreds of corrections facilities for almost forty years without any incident that any person can even remotely link to it, that fact must be considered in evaluating the credibility of the Defendants' claims of danger.  Because Plaintiff has made this point *ad nauseum* in previous pleadings he will not belabor it further.

### b.  The Department Regulation is Facially Invalid

The Louisiana regulation at issue in the immediate case is facially unconstitutional for the reasons illustrated by the facts of this case. The regulation, 02-009, allows prison officials to reject a publication because it is "racially inflammatory" **or**

---

[27] Leonard Depo., Rec. Doc. 47-4-7 at 221.

"contains material that could cause a threat to the inmate population, staff, and security of the facility." Because the prohibition is disjunctive, "racially inflammatory" material may be rejected without regard for whether it poses a threat to security. As explained by expert Steve Martin, for the regulation to be valid, there must be some linkage to *conduct*, either actual or predicted. The Louisiana regulation bans "racially inflammatory" material without regard to whether it has any impact on the prison whatsoever. This cannot be the standard, because the First Amendment requires that prison officials not proscribe speech unless there is an effect on prison security.

> In well-written prison regulations, cited extensively in Mr. Martin's report,
>
> the conduct is conjoined with the content, but 'racially inflammatory' standing alone is so subject to one's own personal view that there's not—I mean, there's not a concrete standard of neutral application with just that term. What in my mind may be racially inflammatory may in your mind be rather mild or inconsequential or whatever. I mean, it would be purely subject to the reader's own individual view.[28]

Arguably "racially inflammatory" views appear in most mainstream publications, and yet should not be banned. For example, in his report, Mr. Martin quotes from the *Newsweek* inaugural edition, which stated, "the ethos of the Africans was shattered; they were brutalized, humiliated, dehumanized and subjected to the indignity of being stripped of their names and heritage, and their families were disassembled."[29] This language is very similar to that contained in "The Muslim Program," yet *Newsweek* is admitted to the prisons.[30]

The problem with the Louisiana regulation, facially, is that it allows for the purely subjective evaluation of material without any requirement that there be a threat to

---

[28] Martin Depo., Exh. 8 at 26.
[29] Martin Depo., Exh. 8 at 41; Martin Report, Exh. 1 at 7.
[30] Turner Depo., Exh. 9 at 26-27.

9

security sufficient to justify banning a publication. All other publication regulations examined by Mr. Martin contained safeguards, similar to those contained in the regulation in <u>Thornburgh</u>, that both link content to conduct, and that prohibit the imposition of the subjective opinion of the particular decision maker.[31] For this reason, the Louisiana regulation is facially unconstitutional, in addition to being unconstitutional as applied for the reasons articulated previously.[32]

### IV. Plaintiff is Entitled to an Award of Punitive Damages

The Fifth Circuit has long held that an award of punitive damages is appropriate "in the absence of actual damages where there has been a constitutional violation."[33] Punitive damages are appropriate when a government official acts with disregard to civil obligations or the constitutional rights of the plaintiff, and a violation of a long-established right is sufficient to meet this test.[34]

In the immediate case, Plaintiff is entitled to an award of punitive damages because the Defendants acted in direct contravention to established Fifth Circuit case law.[35] Even after Plaintiff brought the illegality of Defendants' conduct to their attention, including citing the Fifth Circuit case directly on point, they have persisted in violating Plaintiff's rights. Additionally, a report provided by the Defendants states, "after a long string of cases in the 1960s, the federal courts finally held that black supremacy alone was not sufficient to justify suppression of the Black Muslim faith. The courts ruled that the Nation of Islam and Moorish Science Temple constituted established religions;

---

[31] Martin Depo., Exh. 8 at 48 (Bureau of Prisons); Martin Depo., Exh 8 at 50-52 (Texas); Martin Depo., Exh. 8 at 59 (Wisconsin); <u>Thornburgh v. Abbott</u>, 490 U.S. 401 (1989).

[32] Rec. Doc. 47-1.

[33] <u>Hutchins v. McDaniels</u>, 512 F.3d 193, 197 (5th Cir. 2007), citing <u>Williams v. Kaufman County</u>, 352 F.3d 994, 1015 (5th Cir. 2003).

[34] <u>Williams v. Kaufman County</u>, 352 F.3d 994, 1016 (5th Cir. 2003)

[35] <u>Walker v. Blackwell</u>, 411 F.2d 23 (5th Cir. 1969)

therefore, Nation and Moorish prisoners were entitled to follow the practices that their faiths prescribed."[36] Defendant Michael herself wrote the policy in question in the immediate case. She testified that in writing the regulation, she researched other jurisdictions, as well as all applicable jurisprudence.[37] In spite of this, she made a decision to act violation of Plaintiff's rights, and is liable for punitive damages.

## CONCLUSION

As Steve Martin, Plaintiff's expert in prison security, testified,

… those statements are purely opinion statements related to a particular political, religious persuasion that is normal in the discourse of American life. I mean, that's what the 1st Amendment permits, provides, and even such in the prison setting up to the point where such an opinion would be encouraging, depicting, inciting those in prison to engage in some conduct. Those statements just simply, in my view, do not meet that test. They're viewed in the context and purpose of why they were written as opinion pieces related to a particular religious persuasion or political persuasion. That's what they are. They have precious little to do with a prison setting or affecting, encouraging, etcetera, those incarcerated to engage in any conduct.

***
There may be a bit in some reading more pejorative or even repugnant to the reader, but that's not the test. The test is something beyond repugnancy or beyond purely pejorative, strongly opinioned content.[38]

For the foregoing reasons, and for the reasons stated in support of his Motion for Summary Judgment,[39] denial of Defendants' Motion is appropriate, and the Court should enter an Order in Plaintiffs' favor.

---

[36] Hamm Report, Exh. 7 at 17.
[37] Michael Depo., Exh. 10 at 78, 91-92
[38] Martin Depo., Exh. 8 at 19.
[39] Rec. Doc. 47 *et seq.*

Respectfully submitted,


NELSON CAMERON (#01283)
*Cooperating Attorney, American Civil*
*Liberties Union Foundation of Louisiana*
675 Jordan Street
Shreveport, Louisiana 71101
PH:       (318) 226-0111
FAX:     (318) 226-0760
Email:   eganspk@bellsouth.net


/s/ Katie Schwartzmann
KATIE SCHWARTZMANN (#30295)
*Legal Director, American Civil*
*Liberties Union Foundation of Louisiana*
P.O. Box 56157
New Orleans, Louisiana 70156
PH:       (504) 592-8056
FAX:     (888) 534-2996
Email:   kschwartzmann@laaclu.org

Counsel for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of May, 2009, a copy of the foregoing Memo and all accompanying attachments were filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/ Katie Schwartzmann
KATIE SCHWARTZMANN
*Counsel for the Plaintiff*