U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

MAR 3 1 2010

TONY R. MOORE, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| HENRY LEONARD | CIVIL ACTION NO: 07-0813 |
| VERSUS | JUDGE DONALD E. WALTER |
| STATE OF LOUISIANA, ET AL. | MAGISTRATE HORNSBY |

## MEMORANDUM RULING

Before the Court are cross motions for summary judgment filed by the Plaintiff [Doc. #47] and the Defendants [Doc. #45].  For the reasons assigned herein, Plaintiff's motion [Doc. #47] is hereby **GRANTED IN PART**;  Defendants' Motion for Summary Judgment [Doc. #45] is **DENIED**; Plaintiff's Motion for Leave to file Motion to Strike [Doc. # 52] is **DENIED AS MOOT**.

## STATEMENT OF THE CASE

Henry Leonard ("Plaintiff") is a prisoner housed at the David Wade Correctional Center ("DWCC").  Plaintiff alleges that he has been a member of the Nation of Islam ("NOI") since 1985.  Plaintiff subscribed to *The Final Call*, a publication of the NOI, but DWCC denied him access to and receipt of the publication beginning May 16, 2006.  Prison officials allegedly banned *The Final Call* asserting that the publication interferes with rehabilitation of inmates and/or the maintenance of internal security.  Plaintiff maintains that there are no other NOI materials available in the DWCC library or chapel, and that *The Final Call* is the only available source to acquire additional materials related to his religion.  Plaintiff denies that the publication poses any threat to order or safety at DWCC.

1

Plaintiff names as Defendants the State of Louisiana, through the Department of Public Safety and Corrections ("DOC"); Secretary Richard Stalder; DWCC Warden Venetia Michael; and Lt. Col. Jackie Hamil, a corrections officer at DWCC.   The complaint asserts a claim under 42 U.S.C. §1983 on the grounds that denial of *The Final Call* violates Plaintiff's right to free exercise of his religion guaranteed under the First and Fourteenth Amendments.   Plaintiff asserts a second claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Additionally, Plaintiff seeks injunctive relief and damages.

## I.    **Procedural Background**

Defendants filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Doc. #13].   This Court adopted the Report and Recommendation of Magistrate Hornsby, which granted in part and denied in part Defendants' Motion to Dismiss. [See Docs. #21 and 23].   Plaintiff's claims against the Defendants in their official capacities were limited to prospective injunctive relief. [Doc. #23].   Plaintiff's RLUIPA claims against Stalder, Michael, and Hamil in their individual capacities were dismissed.   *Id.*   Plaintiff's claims for compensatory damages were dismissed with prejudice pursuant to 42 U.S.C. §1997e(e).   *Id.*   Finally, Plaintiff's section 1983 claims against Stalder in his individual capacity were dismissed based on qualified immunity. *Id.*

Plaintiff's remaining claims consist of the following: (a) RLUIPA claims against the State of Louisiana, as well as Stalder, Michael and Hamil in their official capacities only; (b) a 42 U.S.C. §1983 claim against the state of Louisiana, Stalder in his official capacity only, and Michael and Hamil in their official and individual capacities; (c) injunctive relief; (d) nominal and punitive damages and (e) attorney's fees.

2

The parties agreed with the Court that this matter only involves issues of law and could be decided based on the pending cross-motions for summary judgment and evidence therein. [Doc. #58]. The Court heard oral arguments from both parties.  [Doc. #62].

## II.    Factual Background

Plaintiff is a prisoner housed at DWCC since the beginning of July 2004.  [Doc. #47-2, Plaintiff's Uncontested Material Issues of Fact].  He is a former Baton Rouge police officer who is incarcerated for the murder of his estranged wife's boyfriend. [Doc. #47, Ex. 1 at 13-15, 19]. Because he is a former member of law enforcement, Plaintiff is housed in the N-5 protective work unit, separate and apart from the general population. [Doc. #45-2, Defendant's Statement of Uncontested Facts; Doc. #42-2, Plaintiff's Uncontested Material Facts].   The N-5 dormitory is located in a separate building from the general population, and is reserved for prisoners who need protection or are high profile. [Doc. #42-2, Plaintiff's Uncontested Material Facts].   The N-5 dormitory consists of only single one man cells, such that Plaintiff does not share a cell with a fellow inmate. [Doc. #42-2, Plaintiff's Uncontested Material Facts].

Plaintiff has been a member of the NOI church since 1985. [Doc. #47, Ex. 1 at 19]. The NOI is a recognized religion and is a sect of the Islamic faith. [Doc. #42-2, Plaintiff's Statement of Uncontested Facts].   NOI members are believers of Islam who adhere to the teachings of the Quran. [Doc. #47, Ex. 2 Muhammad at 11-13].   However, NOI members hold additional beliefs. Specifically, NOI members believe that in the 1930s Allah came to earth in the form of a person named W. Fard Muhammed, who then provided inspired teachings to the Most Honorable Elijah Muhammed.   [Doc. #47, Ex. 2 Muhammad at 11-13]. NOI members believe that Allah appeared with a mission to raise "the mentally and spiritually dead," those being the black communities of

3

America, "who for all intents and purposes are dead" due to slavery and its aftermath. [Doc. #47, Ex. 2 Muhammad at 20, 22]. Plaintiff maintains that the teachings of W. Fard Muhammed and Elijah Muhammed are the "cardinal principle" of NOI and a distinguishing mantra from orthodox Islam, which rejects as blasphemy the idea that Allah appeared in the form of W. Fard Muhammad. [Doc. #47, Ex. 3 Abdullah at 17-18].

The NOI publishes a weekly periodical entitled *The Final Call*, which contains articles related to the faith. [Doc. #47-2, Plaintiff's Statement of Uncontested Facts]. *The Final Call* is the exclusive outlet for the Plaintiff to order additional NOI religious materials. [Doc. #47-2, Ex. 1, Leonard at 116-118]. It has also been described by a NOI Minister as "the organ that consistently provides the member with [repetition and reiteration of] our theological base.....it is the source through which members [] get reading material and have access to CDs, DVDs, and other materials....it is our primary organ to propagate our religion." [Doc. #47-2, Ex. 2, Muhammad at 166-168].

Neither DWCC nor any other Louisiana Department of Corrections facility offer NOI services. [Doc. #47, Ex. 1 Leonard at 99]. Additionally, DWCC does not have NOI religious materials on hand, only traditional Islam study materials. [Doc. #47, Ex. Leonard at 73]. DWCC has made efforts to accommodate the traditional Muslim faith. DWCC has hired Iman Wali of the Al-Islam sect to provide Islamic services to the Muslim community housed at DWCC. [Doc. #45, Ex. 1 at 72-77]. Muslim prisoners are allowed to possess prayer rugs, religious materials, and the Quran in their housing units. [Doc. #45, Ex. 1 at 72-77]. DWCC also provides weekly Jum'mah services, daily Taleem or Ars Salant study programs, non-pork diet accommodations, and fasting accommodations during Ramadan. [Doc. #45, Ex. 1 at 1 at 72-77]. Although all of these services

4

are available to Plaintiff, he maintains NOI doctrine is distinct from Islam and that traditional Islam services are insufficient.

Plaintiff subscribed to *The Final Call*, and first began receiving it at DWCC in October 2005. [Doc. #47-2, Plaintiff's Statement of Uncontested Facts]. He continued to receive *The Final Call* until he received a Notice of Refusal, dated June 14, 2006, and signed by Officer Jackie Hamil. [Doc. #47-2, Plaintiff's Statement of Uncontested Facts]. Plaintiff received a second Notice of Refusal signed by Officer Hamil dated August 17, 2006. [Doc. #47-2, Plaintiff's Statement of Uncontested Facts]. Since that time Plaintiff has not received any additional issues of *The Final Call*. [Doc. #47-2, Plaintiff's Statement of Uncontested Facts].

DWCC maintains *The Final Call* was rejected because of security concerns created by some of the articles contained in the periodical, which DWCC views as racially discriminatory, provocative, and a concern for security. Specifically, DWCC cites to numerous sources as support that the NOI is a black separatist and/or supremacist group, and that certain articles contained in *The Final Call* are racially inflammatory. [Doc. #45-3 at 4, Ex. 10]. Most concerning to DWCC is the final page included in all issues of *The Final Call*, which is entitled "The Muslim Program". [Court Ex. 1]. It includes statements about "What Muslims Want" and "What Muslims Believe". "The Muslim Program" was written by Elijah Muhammad in the 1960s and has appeared in every issue of the newspaper since that time. It is this single page which DWCC cites as the primary reason for not allowing the delivery of *The Final Call*. That page reads as follows:

### What The Muslims Want

This is the question asked most frequently by both the whites and the blacks. The answers to this question I shall state as simply as possible.

5

1.   We want freedom. We want a full and complete freedom.

2.   We want justice.  Equal justice under the law. We want justice applied equally to all, regardless of creed or class or color.

3.   We want equality of opportunity. We want equal membership in society with the best in civilized society.

4.   We want our people in America whose parents or grandparents were descendants from slaves, to be allowed to establish a separate state or territory of their own--either on this continent or elsewhere. We believe that our former slave masters are obligated to provide such land and that the area must be fertile and minerally rich. We believe that our former slave masters are obligated to maintain and supply our needs in this separate territory for the next 20 to 25 years--until we are able to produce and supply our own needs.

     Since we cannot get along with them in peace and equality, after giving them 400 years of our sweat and blood and receiving in return some of the worst treatment human beings have ever experienced, we believe our contributions to this land and the suffering forced upon us by white America, justifies our demand for complete separation in a state or territory of our own.

5.   We want freedom for all Believers of Islam now held in federal prisons. We want freedom for all black men and women now under death sentence in innumerable prisons in the North as well as the South. We want every black man and woman to have the freedom to accept or reject being separated from the slave master's children and establish a land of their own.

     We know that the above plan for the solution of the black and white conflict is the best and only answer to the problem between two people.

6.   We want an immediate end to the police brutality and mob attacks against the so-called Negro throughout the United States. We believe that the Federal government should intercede to see that black men and women tried in white courts receive justice in accordance with the laws of the land--or allow us to build a new nation for ourselves, dedicated to justice, freedom and liberty.

7.   As long as we are not allowed to establish a state or territory of our own, we demand not only equal justice under the laws of the United States, but equal employment opportunities--NOW!

We do not believe that after 400 years of free or nearly free labor, sweat and blood, which has helped America become rich and powerful, so many thousands of black people should have to subsist on relief or charity or live in poor houses.

8.   We want the government of the United States to exempt our people from ALL taxation as long as we are deprived of equal justice under the laws of the land.

9.   We want equal education--but separate schools up to 16 for boys and 18 for girls on the condition that the girls be sent to women's colleges and universities. We want all black children educated, taught and trained by their own teachers. Under such schooling system we believe we will make a better nation of people. The United States government should provide, free, all necessary text books and equipment, schools and college buildings. The Muslim teachers shall be left free to teach and train their people in the way of righteousness, decency and self respect.

10.  We believe that intermarriage or race mixing should be prohibited. We want the religion of Islam taught without hindrance or suppression.

## What The Muslims Believe

1.   WE BELIEVE In the One God whose proper Name is Allah.

2.   WE BELIEVE in the Holy Qur'an and in the Scriptures of all the Prophets of God.

3.   WE BELIEVE in the truth of the Bible, but we believe that it has been tampered with and must be reinterpreted so that mankind will not be snared by the falsehoods that have been added to it.

4.   WE BELIEVE in Allah's Prophets and the Scriptures they brought to the people.

5.   WE BELIEVE in the resurrection of the dead--not in physical resurrection--but in mental resurrection. We believe that the so-called Negroes are most in need of mental resurrection; therefore they will be resurrected first. Furthermore, we believe we are the people of God's choice, as it has been written, that God would choose the rejected and the despised. We can find no other persons fitting this description in these last days more than the so-called Negroes in America. We believe in the resurrection of the righteous.

7

6.    WE BELIEVE in the judgment; we believe this first judgment will take place as God revealed, in America...

7.    WE BELIEVE this is the time in history for the separation of the so-called Negroes and the so-called white Americans. We believe the black man should be freed in name as well as in fact. By this we mean that he should be freed from the names imposed upon him by his former slave masters. Names which identified him as being the slave master's slave. We believe that if we are free indeed, we should go in our own people's names--the black people of the Earth.

8.    WE BELIEVE in justice for all, whether in God or not; we believe as others, that we are due equal justice as human beings. We believe in equality--as a nation--of equals. We do not believe that we are equal with our slave masters in the status of "freed slaves."

We recognize and respect American citizens as independent peoples and we respect their laws which govern this nation.

9.    WE BELIEVE that the offer of integration is hypocritical and is made by those who are trying to deceive the black peoples into believing that their 400-year-old open enemies of freedom, justice and equality are, all of a sudden, their "friends." Furthermore, we believe that such deception is intended to prevent black people from realizing that the time in history has arrived for the separation from the whites of this nation.

If the white people are truthful about their professed friendship toward the so-called Negro, they can prove it by dividing up America with their slaves. We do not believe that America will ever be able to furnish enough jobs for her own millions of unemployed, in addition to jobs for the 20,000,000 black people as well.

10.   WE BELIEVE that we who declare ourselves to be righteous Muslims, should not participate in wars which take the lives of humans. We do not believe this nation should force us to take part in such wars, for we have nothing to gain from it unless America agrees to give us the necessary territory wherein we may have something to fight for.

11.   WE BELIEVE our women should be respected and protected as the women of other nationalities are respected and protected.

12.   WE BELIEVE that Allah (God) appeared in the Person of Master W. Fard Muhammad, July, 1930; the long-awaited "Messiah" of the Christians and the "Mahdi" of the Muslims.

8

We believe further and lastly that Allah is God and besides HIM there is no god and He will bring about a universal government of peace wherein we all can live in peace together.

[Court Exhibit #1].

*The Final Call* was originally rejected because it was found to be in violation of DOC Regulation NO: C-02-009.   The regulation states that a publication may be rejected under the following circumstances:

**Refusal of Publications**: Printed material shall only be refused if it interferes with legitimate penological objectives (including but not limited to deterrence of crime, rehabilitation of inmates, maintenance of internal/external security of an institution or maintenance of an environment free of sexual harassment) or if the refusal is necessary to prevent the commission of a crime or to protect the interest of crime victims.  This would include but not be limited to the following described categories:

The printed matter contains material which, reasonably construed, is written for the purpose of communicating information which could promote the breakdown of order through inmate disruption, such as strikes or riots or instigation of inmate unrest for racial or other reasons.

[Doc. #45-3, Ex. 12.]  After this litigation commenced, DOC amended its regulations and policies regarding inmate publications.  Effective January 5, 2007, DOC Regulation NO: C-02-009 allows for the refusal of an publication as follows:

[] "prohibit any publication that "interferes with legitimate penological objectives," including "racially inflammatory material or material that could cause a threat to the inmate population staff and security of the facility" and "writings which advocate violence or which create a danger within the context of a correctional facility."

[Doc. #45-3, Ex. 14].   DWCC maintains that *The Final Call* is properly rejected under the previous and revised regulation because it contains racially inflammatory material which is a threat to security. [Doc. #45-3, Ex. 12].

9

The revision to DOC Regulation NO: C-02-009 also introduced a classification system of regularly received publications. [Doc. #45-3, Ex. 14, effective January 5, 2007]. Publications are divided into three categories: Category 1 includes publications that are presumptively rejected; Category 2 includes publications that require each issue to be reviewed for compliance with the DOC Regulation; and Category 3 includes publications that are presumptively accepted for distribution to the inmates. [Doc. #45-3, Ex. 14]. *The Final Call* is classified as a Category 2 publication, primarily because of the inclusion of "The Muslim Program." [Doc. #45, Ex. 14, Attachments E, F, and G of Exhibit 13].

Prison mail at DWCC is screened in the following manner. Every piece of inmate mail is screened by mailroom personnel. [Doc. #45, Ex. 24]. An initial reviewing officer is required to bring a publication to the Mailroom Supervisor's attention if he feels that a publication violates DOC Regulation No: C-02-009. [Doc. #45, Depositions of Cain, Goodwin, and LeBlanc.] If the Mailroom Supervisor concurs, the publication is sent to the Warden for review. *Id.* If the Warden concurs, the publication is sent to the Regional Wardens for review. *Id.* If all Regional Wardens unanimously agree, the publication is rejected. *Id.*

As stated *supra*, DWCC rejected *The Final Call* primarily because of the inclusion of "The Muslim Program" found on the last page of each issue. Warden Michael stated in her deposition that DWCC would reject the periodical as long as "The Muslim Program" was included. [Doc. #45-3, Michael at 64]. DWCC made attempts to accommodate the Plaintiff. Warden Burl Cain indicated in his deposition that he tried to contact the NOI to request a modified prison version of *The Final Call* which excluded "The Muslim Program" which could then be allowed into the prison under the regulation. [Doc. #45-3, Cain at 56]. The Nation of Islam did not respond to this request.

10

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56 (c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate the elements of the non-moving party's case, but need only point out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311.

Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine issue of material fact. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355-56 (1986). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d

11

1069, 1075 (5th Cir. 1994) (citations omitted). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

Pursuant to Local Rule 56.1, the moving party shall file a short and concise statement of the material facts as to which it contends there is no genuine issue to be tried. Local Rule 56.2 requires that a party opposing the motion for summary judgment set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## LAW AND ANALYSIS

Plaintiff's Complaint asserts a claim under 42 U.S.C. §1983 on the grounds that the denial of access to *The Final Call* violates his right to free exercise of religion guaranteed under the First and Fourteenth Amendments. Additionally, Plaintiff argues that the denial of access violates the Religious Land Use and Institutionalized Persons Act, or "RLUIPA."

### I.    First Amendment[1]

Prisoners retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. *O'Lone v. Estate of Shabazz*, 107 S.Ct. 2400, 2404 (1987); citing *Cruz v. Beto*, 92 S.Ct. 1079 (1972). Incarceration, however, brings about the necessary withdrawal or limitation of these rights. *Id.* "The constitutional rights that prisoners

---

[1] Defendants devote a large portion of their Motion for Summary Judgment to whether the Court should grant a possible new claim by Plaintiff for all-inclusive Islamic services. It does not appear that Plaintiff is making claim for DWCC to provide NOI specific services. Therefore, the Court will not address the issue.

12

possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 121 S.Ct. 1475.

At the outset of the First Amendment analysis, the Court recognizes that the Fifth Circuit considered a very similar fact pattern in a 1969 case prior to the U.S. Supreme Court's holding in *Turner v. Safley*, 482 U.S. 78 (1987). *See infra.* It is the opinion of the Court that *Walker v. Blackwell*, 411 F.2d 23 (5th Cir. 1969), although forty years old, has not been overruled. The Plaintiffs in *Walker* were NOI inmates at the Atlanta Federal Penitentiary. *Id.* at 24. They filed suit for numerous constitutional violations, including a violation of the First Amendment based on the withholding of issues of *Muhammad Speaks*, the predecessor of what is now entitled *The Final Call. Id.* at 28. "The Muslim Program", which DWCC officials consider inflammatory, has appeared in both *Muhammad Speaks* and *The Final Call* since 1965.

The District Court in *Walker* agreed with the Warden that *Muhammad Speaks* included racially inflammatory information, and that therefore, the exclusion of the newspaper was within the discretion of the Warden as a reasonable disciplinary measure. *Id.* at 28. The Fifth Circuit reversed. The issues of *Muhammad Speaks* that were reviewed contain content which is much more inflammatory than "The Muslim Program" as printed in *The Final Call.* The District Court in *Walker* cited four instances of inflammatory content that supported the rejection of *Muhammad Speaks*, including: (1) a cartoon entitled in part 'Integration Means Hell', showing a line of blindfolded African Americans marching into a pit containing white men with clubs, guns and pistols attacking them; (2) an editorial by Elijah Muhammad referring to the white race as 'devils'; (3) a large cartoon showing an African American sitting prostrate in a chair under a bright light surrounded by police officers with broken clubs, a hammer and a mall, and with the man showing

13

every indication of having been severely beaten by the police officers; and (4) a cartoon of an African American prostrate on the sidewalk being severely beaten by police officers with Uncle Sam standing nearby smiling and saying 'Listen, they are playing our song'.   *Id.* at 28.

The Fifth Circuit found that despite this content, the newspapers were for the most part filled with news and editorial comment, with a substantial portion encouraging NOI members to improve their material and spiritual condition of life by labor and study.   *Id.*   Further, the Court noted that nowhere in the newspaper was there a direct incitement to engage in physical violence.   *Id.* at 29. Accordingly, the Fifth Circuit reversed the District Court and remanded the case for an order to direct the Warden to allow the use of the newspaper by the NOI members in the same manner as other newspapers are allowed to other inmates.   *Id.*   The Court noted that the Warden could appropriately take necessary steps to avoid prison violence if the newspaper were to develop an inflammatory effect on the prisoners. *Id.*

Because this content, which is arguably much more controversial than "The Muslim Program" was found in 1969 by the Fifth Circuit to not be racially inflammatory, this Court must find that "The Muslim Program" is not racially inflammatory.

The U.S. Supreme Court set forth the general test of prison restrictions on an inmate's First Amendment rights in the case of *Turner v. Safley*, 482 U.S. 78 (1987).   *Turner* provides that a restriction is valid "if it is reasonably related to legitimate penological interests." *Id.* at 89.   In making a determination as to whether the impingement meets the penological interest standard, the Court must employ the four factor test set forth in *Thornton v. Abbott*, 490 U.S. 401 (1989).   The factors are as follows: (1) Whether the penological objective underlying the regulation at issue is legitimate and neutral, and that the regulation is rationally related to the objective; (2) whether there

14

are alternative means of exercising the rights that remain open to inmates; (3) what impact the accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison; and (4) whether there are ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Id.* at 414.

As to the first factor, it is the finding of the Court that the penological objective underlying the regulation is both legitimate and neutral, and is rationally related to the objective. The regulation allows for the rejection of a publication which is found to contain racially inflammatory material or materials that could cause a threat to inmate population, staff and security of the facility. [Doc. #45-3, Ex.14]. DWCC has a legitimate objective in trying to decrease racial tensions among prisoners, which can lead to numerous problems up to and including violence. The regulation itself does not violate the constitution, rather, it is the implementation of the regulation which is in conflict with the First Amendment. In this instance, DWCC has prohibited the distribution of *The Final Call* because officials believe "The Muslim Program" is racially inflammatory and could cause a threat to the inmate population, staff and security of the facility. However, the Defendants were unable during briefing or oral argument to provide an example of an instance of violence or unrest in an institutional setting that could be attributed to *The Final Call*. The wholesale prohibition of the publication is simply too broad when balanced with the Plaintiff's right to the free exercise of his religion. This is not to say that prison officials cannot prohibit the distribution of *The Final Call* if upon review it is determined that articles have the intent to incite violence or if *The Final Call* ever develops a substantially inflammatory effect on the inmates. Such actions would be rationally related to the penological objective of preventing security threats to the inmates, staff and the facility.

Additionally, the Court is concerned as to the neutrality of the application of the regulation.

15

Defendants cite to numerous studies in their Motion for Summary Judgment which touch on the radicalization of prison Islamic groups as a potential source of homegrown terrorists. [Doc. #45-3 at 14]. Although the DOC does not consider NOI to be such a radicalized group, it claims that it has a valid penological goal in limiting the number of Islamic sects allowed in state prisons.

As to the second factor, the Plaintiff has no alternative means to practice his religion without receipt of *The Final Call*. While it is true that NOI is built upon the tenements of traditional Islam, and that traditional Islam materials and services are offered at DWCC, there are profound and distinct differences between the two. As discussed *supra*, NOI members believe that in the 1930s Allah came to earth in the form of a person named W. Fard Muhammed, who then provided inspired teachings to the Most Honorable Elijah Muhammed. [Doc. #47, Ex. 2 Muhammad at 11-13]. The teachings of W. Fard Muhammed and Elijah Muhammed are central to the NOI and are distinguishable from the mantra of orthodox Islam, which rejects as blasphemy the idea that Allah appeared in the form of W. Fard Muhammad. [Doc. #47, Ex. 3 Abdullah at 17-18].

*The Final Call* is the only vehicle from which Plaintiff may order additional religious materials from the NOI such as readings, cassette tapes, and featured excerpts. [Doc. #47-2, Ex. 1.] Plaintiff stated in his deposition that he needs to acquire additional religious materials from *The Final Call* to continue growing in his faith. *Id.* At least one circuit has found NOI books, of which *The Final Call* would qualify, to be a necessary element of an inmate's free exercise of the NOI faith. *See Sutton v. Rasheed*, 323 F.3d 236, 255-256 (3d Cir. 2003). The deprivation of NOI texts was found in *Sutton* to deprive the inmate of the ability to practice his religion, and was compared to restricting a Christian's religious readings to the Old Testament, or withholding a copy of *The Book of Mormon* from a member of the Church of Jesus Christ of Later Day Saints. *Id.* at 257.

16

The third factor, which requires the Court to consider the impact the accommodation will have on others (guards and inmates) in the prison, also weighs in favor of the Plaintiff.   Plaintiff has provided evidence that *The Final Call* has been received at DWCC and other DOC facilities without any incidents of violence. [Doc. #47-2, Ex. 1, Leonard at 246-248; Abdullah at 42]. Further, Plaintiff testified that even after the amended policy became effective he retained back issues of *The Final Call* in his possession until September of 2008. [Doc. #47-2, Ex. 9, Goodwin at 44; Ex. 5, Hamil at 41; Ex. 4, Cain at 118].   There is no evidence in the record that the previous copies of *The Final Call* had a negative impact on the security of the prison, the inmates or the guards. As such, it appears that accommodating the Plaintiff with access to *The Final Call* will have a minimal impact.

The fourth factor weighs in favor of the Plaintiff.   This factor requires the Court to consider whether there are ready alternatives that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.   From the record it appears that the alternative is contained within the regulation itself, but is not being applied.   Currently, there is little cost or thought associated with the decision to preclude the distribution of *The Final Call*.   If an issue arrives at DWCC, the mailroom screener need only briefly look at the last page to determine if it contains "The Muslim Program".   If it does, it is rejected.   This method appears to be overly broad and potentially an exaggerated response.

The Court is aware that there will be a slight additional administrative burden on DWCC officials by declaring that *The Final Call* cannot be rejected solely because of the inclusion of "The Muslim Program".   However, *The Final Call*, is already placed in DOC's Category 2 for publication screening.   This category requires that each issue be reviewed for compliance with DOC Regulation

17

NO: C-02-009. Prison officials are already charged under the regulation with screening each issue for racially inflammatory material. This ruling will require the mailroom screener to look through the entire periodical as contemplated by the regulation, which is not an enormous administrative burden when compared with the Plaintiff's ability to practice and grow in his religion of choice.

Because the Defendants are unable to meet the standard set forth in *Turner v. Safley*, it is the finding of this Court that the regulation, as currently applied, is an unconstitutional restriction of Plaintiff's First Amendment right to the free exercise of his religion.

## II.    RLUIPA

Plaintiff also asserts a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which was passed by Congress in 2000 to provide for "a broad protection of religious exercise, to the maximum extent permitted by the terms of [the] Act and the Constitution." 42 U.S.C. §2000cc-3(g).[2]

The relevant portion of RLUIPA states: No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution.... even if the burden results from a rule of general applicability, unless the government demonstrates the imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. §2000cc-1.

The standard under RLUIPA "poses a far greater challenge than does *Turner* to prison

---

[2] Defendants did not address Plaintiff's RLUIPA claims in their Motion for Summary Judgment or Opposition to Plaintiff's Motion for Summary Judgment. Rather, Defendants maintain that all of Plaintiff's RLUIPA claims have been dismissed. Defendants are mistaken. While it is true that this Court dismissed Plaintiff's RULIPA claims against Richard Stalder, Venetia Michael and Jackie Hamil in their individual capacities only, Plaintiff's claims against the Louisiana Department of Corrections and the Defendants in their official capacities remain viable. [Doc. #23].

regulations that impinge on inmates' free exercise of religion. *Freeman v. Texas Dept. of Criminal Justice*, 369 F.3d 854, 858 n.1 (5th Cir. 2004).

The Plaintiff must demonstrate that the government practice complained of imposes a "substantial burden" on his religious exercise. *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004). This requires the Court to answer two questions: (1) Is the burdened activity a "religious exercise," and if so (2) is the burden "substantial"? *Id.* The plaintiff has the burden of persuasion on these two elements. *Id.*; citing to 42 U.S.C. §2000cc-s; 146 Cong. Rec. S7776 (July 27, 2000). The government then has the burden of persuasion that the application of its substantially burdensome practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.*

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Atkins*, 393 F.3d at 567. Plaintiff argues that *The Final Call* is an important element of the free exercise of his religion. As noted *supra*, other Courts have acknowledged that NOI is a legitimate religion, and that *The Final Call* is "an essential religious text for the Nation of Islam." *See Sutton v. Rasheed*, 323 F.3d 236 (3d Cir. 2003). This Court agrees that receipt of *The Final Call* is an essential part of the NOI faith.

Whether the denial of *The Final Call* is a substantial burden is determined as follows:

> For purposes of applying RLUIPA in this circuit, a government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs. [] The effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

19

> On the opposite end of the spectrum, however, a government action or regulation
> does not rise to the level of a substantial burden [] if it merely prevents the
> adherent from either enjoying some benefit that is not otherwise generally
> available or acting in a way that is not otherwise generally allowed.

*Adkins*, 393 F.3d at 569-570.

Plaintiff asserts that the denial of *The Final Call* amounts to a "substantial burden" because it modifies his religious behavior. Specifically, Plaintiff argues that he cannot sufficiently practice his religion by merely praying in his cell. As discussed *supra*, *The Final Call* remains the only source from which Plaintiff can order religious texts and periodicals, which amounts to a denial of NOI religious literature which is distinct from orthodox Islam. The Court finds that Plaintiff has met his burden of persuasion that the denial of access to *The Final Call* solely because of the inclusion of "The Muslim Program" is a substantial burden on the Plaintiff's free exercise of his religion.

Defendants have the burden or proving that the application of its substantially burdensome practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. The governmental interest behind the regulation at issue is obviously compelling. The highest priority of a prison is to maintain order and security. However, the question is whether the banning of *The Final Call* is the least restrictive means of achieving that interest. Again, this Court is concerned that the complete banning of the publication because of the inclusion of "The Muslim Program" is an exaggerated response to DWCC's concerns about racially inflammatory material. Prior to the decision in May 2006 to reject *The Final Call*, the same material had been consistently allowed into the prison, apparently without incident.

The Court finds that the regulation, as currently applied, is in violation of RLUIPA because

20

its implementation is not by the least restrictive means.   DWCC may continue to screen incoming issues of *The Final Call* in accordance with Regulation No: C-02-009, Category 2 screening protocol for racially inflammatory material other than "The Muslim Program".

## CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment [Doc. #47] is hereby **GRANTED IN PART**.   This Court finds that the denial of access to *The Final Call* based solely on the inclusion of "The Muslim Program" is a violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act.   Prospective injunctive relief is **GRANTED**.   DWCC is ordered to deliver future issues of *The Final Call* to the Plaintiff, subject to Department of Corrections Regulation No: C-02-009, and the findings of this Court.   Defendants' Motion for Summary Judgment [Doc. #45] is **DENIED**; Plaintiff's Motion for Leave to file Motion to Strike [Doc. # 52] is **DENIED AS MOOT**.

Plaintiff is ordered to file a supplemental brief with the Court within thirty days regarding the liability of the Defendants, both officially and individually, and as to whether damages and/or attorneys fees are appropriate in this case.   Thereafter, Defendants shall have twenty-one days to file an opposition.

**THUS DONE AND SIGNED**, this ___*3/*___ day of March, 2010.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE

21